Curia, -per Withers, J.
—
The first ground of the motion for arrest of judgment, or for a new trial, is,
That the indictment does not charge the murder by the principal, to be against the Act of the General Assembly in such case.
The principal in the felony is laid to have been the slave of the prisoner, Martin Posey, by name Appling; and in setting forth the murder by the slave, it is charged to have been committed against the peace and dignity of the State. It is argued here that it should have been against the form of the statute in such case made and provided. That statute is supposed to be the Act of 1740, and the 15th section of it, which is in these words: “If any slave in this Province shall commit any crime or offence whatsoever, which, by the laws of England or of this Province, now in force, is or has been made felony without the benefit of clergy, and for which the offender by law ought to suffer death; every such slave, being duly convicted according to the directions of this Act, shall suffer death, to be inflicted in such manner as the justices, by and with the advice and consent of the freeholders who shall give judgment on the conviction of such slave, shall direct and appoint.”
We may waive the question whether any formal conclusion whatever be necessary in that portion of the indictment that recites the crime of the principal, when the principal himself is not indicted. It is proper, however, to remark that the direction of Archbold, (page 520 of the Library edition,) when prescribing an indictment against an accessary *124 for a substantive felony, advises the felony of the principal to be set out as usual, “ exclusive of the conclusion ‘ against the peace,’” &c. By the Constitution of this State, “all prosecutions shalL be carried on in the name of the State of South Carolina, and shall conclude against the peace and , dignity of the same.” This requisition is complied with in ''the present case, for the prosecution here was against the prisoner and did so conclude, and not against the principal, whose felony need be set forth only with such form and certainty as may comport with the rules of criminal pleading, which rules require that the legal characteristics of the crime be averred for the proper information of the party called to answer — that the conclusion which embraces his offence, shall follow, by the logic of the law, from the premises laid, and that the record may be such as can be pleaded in bar upon a subsequent prosecution. It may well be contended that whether the offence, alleged against the principal in this indictment, be one, as to him, against the statute or not, it is not the less completely set forth, in each of its essential ingredients, and as to every purpose of advertising the prisoner, in all that it is convenient and necessary he should know, for the purpose of his defence. Add or emit the words, “ contra formam stqtuti,” the offence of the principal, as murder, is not the less clearly and fully described, nor the prisoner inore or less instructed by the record.
This is an objection as to form. Suppose the slave App (as he was commonly called) had been subjected to trial, in the prescribed forum for his caste, and convicted, and (what is not necessary) the record (sq to call it) of such conviction had been set forth in this indictment, would that matter of form, the omission whereof is now made the ground of objection, have appeared in such case, allowing that it properly should in the case of a white principal? Such form would not have been necessary in the trial of App, and the record of his conviction would not have disclosed his crime with that particularity, in form and essence, which is observed in the indictment as we have it before us.
But the graver question undoubtedly is, was the felony of the pegro such, only by virtue of the statute heretofore cited ? We are of opinion that murder, by a slave, is a felony in him at the common law — that is to say, by the common law as we have it in South Carolina. That the common law of England had undergone a modification with us, as early as December, 1712, is attested by the Act of that date, which gave legislative sanction to that common law, (to he executed among others by the “ chief justice of this Province,) in so far as it should not be “inconsistent with the particular constitutions, customs and laws of this Province.” In no particular copid portions of that body of law be more especially *125 inapplicable than in conferring rights upon slaves, and protection to them, through the action of the higher tribunals of( judicature. Insomuch that we had a proper tribunal provided to try them for common law offences, at the earliest period at which we meet with legislation, and in 1712 it was thought expedient to declare it lawful for a slave to profess the Christian religion, and to receive the rite of baptism, providing, however, as had been done in 1G90, that this should not work manumission. I know of no law in relation to slaves earlier than that of 1690, in the second section of which slaves are declared to be on a footing with other goods and chattels as to payment of debts : in all other cases whatsoever, it was declared that slaves should be accounted freehold, and descend with the land. In the 8th section of the same Act, we find it declared that upon complaint made to any justice of the peace of any heinous and grievous crime committed by any slave, as burglary, robbery, burning of houses,” &c. the justice was directed to issue his warrant, and organize a Court, as specifically provided, try the accused upon evidence, and if the Court adjudge the accused guilty of the offence complained of, “ they shall give sentence of death, if the crime by law deserve, or such other punishment as the crime deserveth.” We see here some common law capital offences specified as examples merely. In such offences as were not specified, and yet deserved death by law, what law defined the offence and prescribed the punishment ? None other than the common law. In case the crime did not deserve death, a liberal discretion was accorded to the Court as to corporal punishment, &c. Certain crimes were then also defined, not known to the common law, for which a negro was to be answerable according to the statute. Can it be doubted that here was a mingling of the common law of England, in its criminal department, with local statutory provisions, as the code for a slave ? A tribunal peculiar, was necessary to try him — but if that tribunal had proceeded to try a negro for rape, what law would he have offended, if not the common law? What law would have furnished the definition ? If any other, it is not known to us. If at this moment, if in all time past, there were not to be found a single statutory enactment as to what should be a crime in a slave, and the Court alone was prescribed to try him, can it beimagned that he could not be made to answer for murder as at common law 1
However unfit the slave has been, and is, to receive the boon of common law rights and privileges, does not its definition of murder well fit him as an agent to perpetrate it; and death, the sanction of its sentence, suit him as a convict 1
When was there a time in the line of our history, that such a proposition was either inapplicable or dangerous 1 The *126 slave was the subject of restraint. At the earliest period that encounter any recognition 'of him in the law, (to wit, 1690,) we find him subjected to a legal trial, (in an inferior jurisdiction tó be sure, but one suited to his case,) and we find him also expressly treated as a person capable' of committing common law felonies, and suffering the highest common law punishments.- The dictate of a high policy has been, and yet is, to observe caution in extending to him, in-his peculiar condition, the shield, not in. averting from him the sword, of common law justice. This is well illustrated by the whole body'of our legislation :.for‘ example, in 1690-all slaves were to have convéniént clothing Once every year: (it is curious that in 1708 soihe were; to enter the militia:) in 1740 they were, under penalty upon the master, to‘have sufficient clothing, covering and food-..in 1821 a white, man guilty of killing a slave, should-suffer as for murder of manslaughter, as the case' might be,. If slaves were not alienable to the common law for any crimes, how shall we interpret .the words of a preamble to the 16th section of the Act of 1740, to wit: and whereas some crimes and' offences Of an enormous nature and the most pernicious consequence, may be committed by slaves as well as other persons, which being peculiar to the situation and condition of- this Province, could not fait within the provision of the laws.of England.” Surely, then, slaves could commit crimes against the laws of England, and even they were considered-not sufficient to embrace all that they' might commit. We suppose the 15lh section, immediately preceding', and' heretofore recited,- to have so announced, and substituting- general words, “ the laws of England,” for the particular specifications of crimes to be found in preceding Acts, to have remitted the. slave to the penalties of the laws, of England for the commission of such crimes as were thereby capital, and such as he could commit.- Iris inconceivable-that our ancestors should have abstained from weaving into their administration of law to slaves such portion of that-common law, imported and admired by them, as suited the anomalous condition in which they found themselves and those persons who, while they were Wholly subject to their power, were as capable as the master of committing any' crime of violence. It might well be, therefore, that in 1712 (and much more in 1849) we had “ particular constitutions and customs,” especially, in relation to this subject, that might be 'considered a- sort of common law of our own, and, deserving the barriers of statutory protection. '
Our conclusion is, that- in laying the crime of the negro Appling, as 'the principal in the murder, it was not necessary to allege that his. offence was “ contra formam statuti.”
The next question that we are t.o consider is, whether *127 there should have been allegation and proof that the principal had been convicted of the murder, or had stood mute, had exceeded his right of challenge.
It was not necessary that there should have .been any allegation of the conviction'-of the'slave. That point was directly and expressly decided in the case of the State Simmons and Kitchen. Held also in the State v. Sims, a point in the case, confirmed in the case -of the State Crank. " - , • .
Proof that a slave,, charged as principal in a murder, stood mute or exceeded his right'of. challenge, are matters inapplicable to this case, • for they do\ not pertain to the trial of a slave. To such a person we do not conceive1 the statute of Anne to apply. Should there have b'een proof of the conviction of the principal?- ‘ ‘
It is undeniable that the common law of England required-not only the conviction, but the attainder, of the principal, before the accessary could be tried. Here was a fair field for the operation of that exception in our Act of 1712, heretofore alluded to, which preserved our “ particular constitutions and customs.” The rule of the common law,, which I- have slated, never could have existed here — never, most clearly, in the case of a slave, who was principal in a murder.. 'Attainder could be reached ip England by outlawry, and it worked a forfeiture of estate. When did attainder or outlawry ever prevail here? How could such ideas. be connected .with a slave ? A bill of attainder was deemed odious enough to be expressly prohibited ’by our paramount law. • The legislation which we find in- the statute of Anne, that of Wm. and M. and our own Act of 1769, as to receivers of stolen goods, and that more general one of 7th George 4th, ch. 64, opening the •way of justice to the accessary, shows how unsatisfactory the doctrine of thé common law became, which conceded immunity to the instigator of crime, .-until a certain disposition was made of his principal.' ' That doctrine is the fruit of a metaphysical idea — that the crime of the accessary is derivative, not substantive — no principal .no accessary. It was furthermore determined that the existence of the fact, that there was a principal, must be ascertained judicially — by record only. Yet, until the statute of Anne, that was' not enough — for the accessary was safe, notwi thstanding the con--viction of the principal, if the latter had escaped attainder, or had been pardoned. Meantime- it was holden that if the principal were judicially, ascertained by conviction and -attainder, that was no more than prima facie evidence of his guilt against the accessary; for he might still controvert the guilt of the principal. The law was said to be solicitous to avoid the abhorrent consequence' of the accessary being hanged, and the .principal acquitted. Yet the case has occur *128 red. The outlawry and attainder of the principal were reverse(^ an(j tfi0UgtL that permitted the heir of the accessary ' to enter on his freehold, otherwise forfeited, it did not recall his ancestor to life who had been hanged. So stringent is this doctrine, as once administered in England, (and it seems in Massachusetts also,) that if the principal died, even as jfeio de se, or, as I suppose, if he had been executed by the law for a different felony, the accessary was safe, he who is often, if not generally, much the more flagrant offender. The doctrine of which I have been treating has never been affirmed, so far as I know, in the jurisprudence of this State. It has been repudiated in three known cases, by judicial opin-i°nj if not by necessary decision — in Sims’s case, in Cranks’s case, and in the case of Elizabeth Green * In the latter *129 case there was a count in the indictment which charged the murder of the prisoner’s husband to have been committed by a person unknown, and that Elizabeth Gieen was an acces-sary before the fact. Judge' O’Neal! argues upon the question arising upon that count as follows: “ If. indeed, it had been necessary that the conviction 'of the principal should have been stated in the indictment, then the objection would have been fatal. But in Sims’s case it was ruled that it was unnecessary to set out the conviction of the principal. It is, however, true that although this might not be cause to arrest the judgment for any defect in the indictment, yet if the ac-cessary cannot, in the ca'se of murder committed by a person *130 unknown, be put upon his trial until the principal he tried an¿ convicted, the judgment could not be given on the conviction on this count. But T apprehend such a perfect security- to crime is not to be found sanctioned by the common law. When the principal was dead the accessary could be tried, and the reason there extends to this case. In both, unless the accessary can now be tried, he is forever to go free ; and in both there is no danger that he may be convicted and his principal afterwards acquitted; for in this case, as long as the murderer remains undiscovered,’ there can be no other trial — when discovered he must be convicted.”
In each of these cases, it must be admitted, the decisions *131 can rest upon other grounds. But they show the strong current of judicial opinion towards the end of so moulding the( antient doctrine, as to principal and accessary, based upon attenuated and occult reasoning, as to conform, it to the necessary course of justice towards great felons, and the understanding of mankind at this day. If the Courts of England were so fettered by a long course of judicial decision and refinement that the legislative arm has been extended more than once to unbind them, it is fortunate for the security of society that we are not. I may be pardoned for imputing refinement to the reasons that controlled the earlier sages of the law, in contriving the rules they proclaimed upon this *132 subject, and so creating the supposed necessity for the provi-of 1 Anne, ch. 9, when I invoke the authority of so §reat a name as Foster’s. At page 362 of his discourses on crown law, he observes: “There were, at common law, some other rales touching the' connection between principal and accessaries, not, I doubt, perfectly well founded,” and he instances the cases of the principal standing mute of malice, challenging above the legal number of the jury, or refusing to answer directly to the charge; “because (say the books) the principal was not attainted. These rules seem not to have been founded in the same natural justice or sound policy as those I first mentioned.” “It would, I think, (he con tin- *133 ues.) be extremely difficult for a common understanding, un-practised in artificial reasoning, to have discovered that mere obstinacy of one incorrigible offender, an obstinacy too that exposeth him to the severest capital punishment the law knoweth of, should, by the appointment of the same law, -stop the course of justice against another.” This may serve somewhat to soften the asperity of accusation if our Courts should, in moulding the common law to our “ particular constitutions and customs,” as they are bidden to do by the Act of 1712, have felt the force of Sir Michael Foster’s reasoning, and have affirmed (as was done in Sims’s case) that the impossibility of trying the principal should be'equivalent to *134 his outlawry and attainder, to his standing mute, or challenging above 20 of the jury. Surely if the leading reason of the antient rule be, as assigned by some of the profoundest expounders, that it was of the first necessity to avoid the inconsistency of the execution of the accessary and the acquittal of the principal, our proposition is well maintained by it, and is more secure against its violation than in the case of outlawry, as has been hinted at before. Nor are we open to the charge of usurpation: we have but followed the necessary action and steady example of all common law Courts. By what process, except that of moulding the asperities of the system, whose great excellence is its capacity for this *135 process, to the requirements of its own fundamental structure and the highest necessities of the people whom it governs — ^ by what other power except that of its authorized expounders, has the distinction been exploded between principals in the first a,nd second degree ; and the accessary at the fact been converted into a principal — and the old doctrine superseded, that an accessary to several principals might be tried and punished after the conviction of one of them; besides a multitude of other instances of like import, that might be cited ?
But considerations peculiar to this case, in any view of the question discussed, must overwhelm the prisoner’s objection, *136 that the conviction of his principal has not been established. His principal was a slave, his own slave — he has murdered him, (for we treat as undeniable what the jury has affirmed :) if outlawry and attaint were lawful, and stood in the stead of conviction, the prisoner has done more than to outlaw and attaint his principal, in every practical sense. It is not the comparatively indifferent question, shall one take advantage of his own wrong'.2 It is the startling question, shall the prisoner derive his exemption from conviction for one shocking murder by the perpetration of another — concocted and executed for that very purpose ? If the accessary might waive the condition precedent, depending on the conviction *137 of his principal, has this accessary not written his waiver in perfidy and blood ? How can the caution of the common law, in its extremest mood of favor to the accessary, be forced to apply, in its principles or administration, to such a case as this? Where can such an instance be found? Since we are not able to imagine an answer to such inquiries, favorable to the prisoner, we are bound to overrule the second ground of his motion.
His third position is, that he could hot, by the law of the land, be an accessary before the fact to murder committed by his own slave, by his command and coertion.
This proposition may be true in its precise terms, but it *138 presents quite a different case from that which is before us. In 1690, as in 1740, a slave was punishable (progressively as he multiplied the offences) for striking, maiming, wounding or bruising a white person, unless he did the act “ by the command and in the defence of the person or property of the owner or other person having the care or government of such slave in which case the slave was excused, and the owner or other person was answerable. We cannot well insert here a collation bearing upon this question, from the voluminous testimony reported ; but it may be safely affirmed that the most diligent examination will be vain to discover any single fact that imports command 'or coertion, diieeted *139 by the prisoner to App. There is enough going to develope the arts ot persuasion — the temptation of high bribery — the, wicked debauchery of the slave’s lingering sentiment of duty — the smothering of that still small voice of a feeble though better conscience than his master’s — the preparation of a heart of itself a little inclined to recoil from the perpetration of the bloodiest and the darkest deed — enough to show forth the most atrocious features of an accessary’s crime, but yet not so much as to prove that there was, in legal contemplation, no principal in the tragedy. It cannot be necessary to expand our reasoning to show that there is the widest difference between the case in hand, and that which discloses the act of a slave in the presence of the owner, and *140 driven by his command and coerlion. Surely App could beeti punis[ied in this case, if he had been tried and the 'facts before us had appeared. It is not the case, then, con-^empletled by our statute, law, where the slave shall be held irresponsible; nor is it within that doctrine of the common law which teaches us that “ where an offence is committed through the medium of an innocent agent, the employer, though absent when the act is done, is answerable as a principal.” “Thus if a child under years of discretion, or any other person of defective mind, is incited to commit a murder or other crime, the inciter is the principal ex necessitate, though he were absent when the thing was done.” After the cases of Simmons and Kitchen, of Sims, of Crank, and of *141 Wright, to which may be added the cases of the ¿State v. Chittcm, and the State v. Longhridge, it is too late to insist that a free white man may not he an accessary to a slave the perpetration of a felony. Indeed we may admit, for this end, the prisoner’s argument, that slaves can be felons only in virtue of our statutory law, and we shall then be able to say, “if an Act of Parliament enact an offence to be felony, though it mention nothing of accessaries before or after, yet virtually and consequently those that counsel or command the offence are accessaries before the fact.” The case cited from 1 Brevard, p. 6, comes very near the precise point, that the master may be accessary to his own slave in murder. It does, in fact, decide that the mistress may — for Cynthia Simmons was the mistress of the slave who was the principal in the murder. The rule must be that wheresoever the slave is amenable as for a felony, there he may have an accessary, whether he be master or other person.
The third ground must, therefore, be resolved against the prisoner.
The fourth and fifth grounds of the motion have not been pressed, and manifestly are unsubstantial.
The sixth and last alleges inconsistency and absurdity against the verdict, inasmuch as it finds the murder of the same person to have been committed both by drowning and by beating.
We do not thus apprehend the matter. Suppose two persons had been incited by the prisoner to murder his wife — ■ that on one day one of them had stabbed her fatally, though she lingered ; that on the next day the other had set fire to the house wherein she lay and consumed her, yet alive, though necessarily to die from the prior injury — and that in two separate counts the prisoner had been indicted as accessary to these principals, the manner of the death by the hands of each being alleged as has been supposed — would a verdict of guilty, upon both counts, be irrational or inconsistent with the truth % That, however, would not vary in substance from this case. Again : there were various counts in this indictment quite inconsistent with each other, as to the form in which the prisoner’s guilt was alleged, and the means by which the death was laid to have been inflicted. If the jury had found a general verdict of guilty, it would, by well settled law, have been referred to any count sufficient in itself, and supported by the evidence. We must, therefore, be led to a satisfactory conclusion against the last ground of the motion.
Upon the whole it becomes our duty, rendered painful by the consequence that must follow, to pronounce that the motion in this case be dismissed.
The whole Court concurred.

Motion refused.

 The State y. Elizabeth Green.
Although an act be done by one unknown, yet if another be actually or constructively present, aiding and abetting, it may be laid in the indictment as the act of the aider or abetter.
The distinction of principal in the first and second degree was a mere distinction in fact, and is no longer recognized.
A count in the indictment charged the murder to have been committed by a person unknown, and that the prisoner was accessary thereto before the fact. The count was held to be sufficient.
Parol evidence offered to prove the result of the trial had in the Court of Magistrates and Freeholders, held to be incompetent.
Éefure O’Neall, J. at Union, Fall Term, 1836.
INDICTMENT FOR MURDER.
His Honor reports as follows:
The prisoner was indicted with Head, for the murder of Henry Green, her husband. The first count in the indictment charged the murder to have been committed bj a person unknown, and that the prisoner was accessary thereto, before the fact. The second count charged Head as the person who'committed the murder, and the prisoner as an accessary before the fact. The third count charged the prisoner with the commission of the murder by the agency of an unknown person.
The deceased, Henry Green, on the night of the 27th of December last, in Union District, had been at a meeting for religious worship, at the house of a Mr. Estis. His wife, (the prisoner,) was at the same meeting. He was shot by some person unknown, (as appears from the verdict of the jury in this case,) on his return from the meeting, as he was walking along a road leading from Estis’s through the woods to his own house. When shot, he had with him a little boy. His wife and other persons were thirty or forty yards behind him. The guilt or innocence of the prisoner depends upon a Variety of circumstances, which from the proof may be stated as fol *129 lows, viz: The prisoner and .her husband lived unhappily together ; he drauk to great excess. Some time before the murder of Green, the prisoner staled to one witness, Miss Polly Estis, that she would give any man $100 to kill him — -payable half the Christmas now passed, another half the Christmas ensuing. To her neice, Nancy Burnett, on one occasion she said she would give $100 to any one who would kill him, or contrive to have him killed. On another occasion, she asked the. same witness if she had not friends who would kill him ; to any one who would kill him she said she would, after his death, give his mare, saddle and bridle. She also said to her, that Green was her’s (the prisoner’s) devil, and Dodd (the prosecutor) was the witness’s devil, and that of her family, and if she, the witness, would kill Green, she, the prisoner, would kill Dodd. If she, (the witness,) heard of either of them being killed, the prisoner told her to think of what she had heard. To this same witness, at the first conversation, she expressed her regret, on being informed by her that she had been at the Court House, that she had not known it, saying she wanted som.e “ Ratsbane.'1'1 The witness asked her what she wanted with it. -She replied by asking if she did not know that it was the strongest poison? She (the prisoner) said she could pick a hole in an apple or piece of gingerbread, and put some of the Rats-bane in it and give it to a person to eat and it would kill. She then asked the witness if she would not pick a hole in an apple, or a piece of gingerbread, and put some of the poison in it, and give it to Green ? The witness replied that she would not for any thing in the world. Shortly before the murder, the deceased came borne bringing some brandy with him, which he got of Mr. Murphy, (and which it appeared had not, when sold, any thing poisonous or sickening in it, beyond its appropriate qualities,) the prisoner prepared some of it and brought it to deceased to drink; he declined drinking then, saying, give it to Polly, (the witness, Miss Estis.) The prisoner said she had given some to her, which was not so; she said that she had sweetened and put some spice- in it for him. He drank some it, a single mouthful, and in a few minutes it made him very sick, he vomited much, a good deal of blood, he sat down on the bed, saying that every thing seemed to be white like snow. The prisoner pushed him backwards on the bed, saying that nothing was the matter with him. The witness, Miss Estis, said, he appeared to be sober when he drank the brandy prepared by his wife. Mr. Murphy, who sold him the *130 brandy, said when lie got it from him he was not drunk; he had however drank some, and was beginning to feel it, and that he had to carry the brandy in a jug, six miles. The prisoner was at the house of Mr. Burnett in company with the deceased, the Saturday night before the murder — on her way home, she said, to Mr. Burnett, she expected there would be an alteration in her family in a few days, and she hoped it would bo for the better. In a conversation with Wm. Malone, who was helping Breen about building a house, she said that “ they had all sorts of a fuss the night before — Green had run them all off.” She said to him that she wished ho would start some sort of a fuss, induce Green to strike him, jump on him and pull out his eyes; she would rather support him in-that condition, than to be plagued with him as slic was. To ber nepliew Murphy, a week before Green’s death, she propounded the question, whether it was an unpardonable sin to kill a person ? She said she had been thinking about that question. She said to her brother-in-law, Wm. Landrum, 4 or 5 days before Green’s murder, that she dreaded to go homo, she had left her husband without bis knowledge, and that bo was drinking. She said she thought slie could get rid of him for $50 ; she said she would go back, and if he did not kill her in 3 or 4 days, she would take shipping and go and get rid of him. To Asa Dodd, the prosecutor, 6 or 8 weeks before Green’s death,, she said, on his enquiring for Greon, that he was at Gossett’s, where he had been lying drunk all day Sunday, disgracing her. She said that she could not live with “that man" though she admitted that he treated her well when sober, and when drunk, that she always began a quarrel with him. Sbe said there would be a corpse in that house, meaning Green’s, before green corn. She said to him, “ Dodd, you don’t know what I do.” On-the night of the murder, the prisoner asked the witnesses, Polly Estis, Nancy Irby and others, to go with her from the meeting; she and they started from the house before the deceased. She asked them to stop and let bim go by, wliicb was done ; after a little she fancied she saw him coming back, and exclaimed, “la, he is coming,” bade Miss Estis and some others good bye,and wenton ahead of Reynolds Burnett and Nancy Irby, who were walking together arm in arm conversing — when the gun fired, although Green could not be seen by her or the persons with her, he was heard to make-an exclamation; she instantly cried out, “Henry is killed — the negroes have risen — we shall all be killed” — and ad *131 dressing herself to Miss Irby and Burnett, said, “ you had better go back to Mr. Estis” — at the same moment seizing Burnett by the arm and turning him around — she wet off through the woods towards her own house. There did not appear to have been any apprehensions of a rising among the negroes. Soon after Green was killed, the same night, Dodd went to the house; as he was about to go away, the prisoner said to him, she was almost seared to death, and asked who'it was thought by the people, killed Green ? lie replied “some of you,” for Green had no other enemies. She made no reply.
In the presence of Letitia Turley, on the day on which the prisoner was apprehended and brought to jail, she said “ it was done and over with, and unless some of them turned State’s evidence against the rest, they had done all they could.” On the same day, in the presence of her niece Nancy Burnett, she said “he was done dead and buried, and it was over, if some of them did not turn State’s evidence and hang them, and she hardly thought they would.”
It appears that the prisoner was anxious during the Christmas Holydays to procure a gun for her son James. Boyd — on one occasion she said she must have one if she had to send to the Court House for it — she however did not buy one. Dodd’s gun was at Green’s on the night of the murder — he examined it the same night and said he could not tell whether it had been fired or not: the flint had been altered. Elisha Estis. let James Boyd have one or two loads of powder between 1 and 2 o’clock of the Sunday on the night of which Green was killed — it was wraped in brown paper; he told the witness that some person on Saturday night had got his mare out of the stable, and that he or the deceased on that night (Sunday) was going to sleep in the stable, and for this purpose he wanted the powder. He gave the witness four or five balls, some of which were, produced in Court and proved by Mr Dodd to be of the size of those which entered the body of the deceased. It appeared that on the same day (Sunday) Green was enquiring for powder, saying that his horse had been taken out of the stable. It appeared on examining the place where the gun was fired at Green, that it had been wadded with brown paper.
During last Court the prisoner, in her room in the jail, told Mrs. Head, the mother of the prisoner Head (who was acquitted and the facts concerning whom alone are .not reported) that Green was not killed with either Gossett’s or Dodd’s gun, but with Miller’s. She *132 said, she could tell if she would who killed him: it was, she said, Tommy Ray’s negro man, Edom, who killed him, and she wished his owner knew of it or he would he hung for killing Green. She told her not to tell this conversation at the peril of her life. She also said that on the Saturday night before his murder some person was there getting his horses out of the stable on purpose to get him out and have him killed.
The prisoner contended that the third count in the indictment'was insufficient. I thought it was sustained’ by the case of the State v. Fley Sf Rochelle — the case from Plowd. 97-100, and the reasoning of the Court in the case of the State v. Crank
She also objected to the first count and contended that there could not be an accessary before the fact to a murder committed by a person unknown. I thought otherwise. If this was so, in a large class of cases offenders would escape punishment. The crime of the accessary was the same whether the principal was known or unknown. The only reason why, generally, the principal was to be tried before the accessary, was to prevent a conflict between the verdicts. When there was no such danger, as when the principal was dead or ' pardoned, the accessary might be tried, although the principal had not been.
In the progress of the cause and during the examination of the last witness, Sirs. Head, the prisoner’s counsel would have asked the question whether Ray’s negro man, Edom, had not been tried and acquitted of the murder ? This was objected to and I excluded the evidence — the record was the only proper evidence of an acquittal by a Court. His innocence might have been shewn by parol, independent of the trial had before the Court of Magistrates and Freeholders.
The case was submitted to the jury after a careful explanation of the law, a caution not to convict unless well satisfied of guilt, and a full review of the evidence and its appropriate application. They found the prisoner, Mrs. Green, guilty on the 3d count of the indictment, and I then was and still am satisfied with the correctness of the verdict. The prisoner appeals on the annexed grounds.
The defendant appealed and moved the Court of Appeals for arrest of judgment on the following grounds.
1st. Because the third count in the indictment, on which the defendant was convicted, is insufficient in law.
*133 2nd. Because the first count in the indictment is insufficient in law, an¿ evidence ought not to have been received in support of it, and the said count ought to have been stricken out of the Indictment.
3d. Because the indictment in other respects is insufficient in law.
And for a new trial on the following grounds.
1st. Because evidence ought not to have been received on the first count, being calculated to embarrass the case and mislead the jury; and the presiding Judge should so have ruled and charged.
2nd. Because the Judge refused to permit parol evidence of the trial and acquittal of a negro boy Edom, who was charged with having murdered Henry Green, the deceased. There being no evidence that any record of the proceedings of the Court was made or preserved, and the evidence was offered as a collateral fact, and in answer to evidence brought out by the prosecution.
3rd. Because the verdict was against evidence.
Dawkins Sr Herndon, for the motion.1
Player, Solicitor, contra,
Curia, per O’Neall, J. — The prisoner was tried before me at Union, and this Court, concurring in the general views ,of the law which were taken on the circuit, has instructed me to pronounce the judgment: in doing so I will give to the different.grounds taken all the consideration which my time and opportunity will permit.
The first ground assumes that the third count of the indictment, on which the prisoner was convicted, is insufficient: the count is in the following words, to wit, “ and the jurors aforesaid, upon their oaths and affirmations aforesaid, do further present that Elizabeth Green, late of the district and State aforesaid,spinster, not having the fear of God before her eyes, but being moved and seduced by the instigation of the devil, on the twenty-seventh day of December, in the year of our Lord one thousand eight hundred and thirty-five, with force and arms, at Union Court House aforesaid, in the district and State aforesaid, in and upon one Henry Green, in the peace of God and of this State then and there being, feloniously, wilfully, and of her malice aforethought, did make an assault, and that the said Elizabeth Green, (by the agency and through the means of a certain evil disposed person, whose name to the jurors aforesaid is unknown, and with whom the said Elizabeth Green was then and *134 there co-operating, and whom she was then and there assisting, )with a certain gun of the value of one dollar, then and there charged with gunpowder and five leaden halls, which gun the aforesaid person unknown, for and at the instance of the said Elizabeth Green, in both his hands then and there had and held to, against, and upon the said Henry Green, then and there feloniously, wilfully, and of her malice aforethought, did shoot off and discharge, and the said Elizabeth Green, by the bands of the aforesaid person, to the jurors unknown, with the leaden balls aforesaid, from the gun aforesaid so as aforesaid shot, discharged and sent forth, the said Henry Green, in and upon the right side and between the shoulder and the hip of him, the said Henry Green, then and there feloniously struck, giving to the said Henry Green, then and there, with the leaden balls aforesaid, five mortal wounds, each of the breadth of an half inch, and of the depth of five inches, of which said mortal wounds the said Henry Green then and there instantly died: and so the jurors aforesaid, upon their oaths and affirmations aforesaid, do say that the said Elizabeth Green, the said Henry Green, in manner and form, aforesaid, then and there feloniously, wilfully, and of her malice aforethought, did kill and murder, against the peace and dignity of the same State aforesaid.”
This form is an unusual one; but if it charges the prisonor with the commission of a felony, in known technical terms, and with sufficient certainty, it must be sustained. The prisoner, in this count, is charged with the crime of murder: the'essential technical terms in -the description of that offence arc employed. This will at once be apparent by comparing the conclusion of the count with what is said by Mr. Starlrie iu his Criminal Pleading, “ in indictments for particular felonies, technical and appropriate -words are frequently essential to the description of the offence. Tlius, in an indictment for murder, it is essential to state, as a conclusion from the facts previously averred, that tire said defendant, him, the said C. D. in manner and form aforesaid, feloniously did kill and murder, a term of art which can iu no case be dispensed with.” “ So it must also be alleged, that the offence was committed of the defendant’s malice aforethought, words which cannot be supplied by the aid of any other.” The previous parts of the count arc merely descriptive of the mode and manner in which the murder was committed. The general rule by which we are to judge of the sufficiency of the in *135 dictment, in this respect, is stated in the case of the State v. Crank, “ if enough appear in the indictment to inform the prisoner to what he is to answer, to enable the jury to pass on his guilt or innocence, and the Court to pronounce the judgment of the law, it is generally sufficient.” In the present case, if the indictment had laid the murder to have been committed by a person unknown, and that the prisoner was aiding and abetting the commission of the murder, then the manner in which the act of the prisoner is described, would not have been sufficient. Starkie, in his Criminal Pleading, 93, speaking of the form of charging defendants as aiders and abettors, says : “ After alleging the offence of the principal, with its circumstances, the indictment may allege generally, that E. F. &e. was feloniously present, aiding and abetting, at the felony and murder (as the case is) committed in manner and form aforesaid. And the averment that the party was present aiding and abetting, cannot be supplied by any argument, implication or intendment.” So that it would be plain on authority, if the indictment had charged another with the murder, and the defendant as an aider or abettor merely, that the words “with whom the said Elizabeth Green was then and there co-operating, and whom she was then and there assisting,” would have been insufficient. But the charge here is against the prisoner as a principal in the first degree; she is charged that she feloniously, wilfully and of her malice aforethought, did make an assault upon Henry Green, and that she, by the agency of an unknown person, &e. with a certain gun of the value, &c. charged, &c. which gun the aforesaid person unknown, for and at the instance of the prisoner, in both his hands, &c. then and there feloniously, wilfully, and of her malice aforethought, did shoot off and' discharge, and that she, by the hands of the aforesaid person, &c. the said Henry G-rcen, in and upon, &c. struck, giving, &c. The act done, from which the death of the deceased resulted, is charged as her act, and the agency of the unknown person is merely instrumental. There can certainly be no objection to this particularity, if the prisoner can be charged as a principal in the firsi degree. For if the murder committed might have been laid throughout, as her act, without noticing the agency of the unknown person, then the introduction into and statement of that fact in the indictment cannot vif iate it: it only makes more certain the charge, and better enables the prisoner to answer it. The distinction between a principal in the first, and a *136 principal in the second degree, may be regarded as exploded. That 0pini0n was expressed by Judge Brevard, in the State v. Fley and ’ Rochelle, and intimated by myself in the case of the-Siaiev. Crank, and now, upon a more careful examination of the authorities, I am satisfied to say that that intimation is matured into a settled opinion of the Court. Starkie, in his Criminal Pleading, says: “in general where A and B are present, and A commits an offence in which B aids and assists him, the indictment may either allege the matter according to the fact, or charge them both as principals in the first degree ; for the act of one is the act of the other.” And at page 89 he says, “ So A and B, if present aiding and abetting, may be convicted, though a person not named in the indictment committed the act.” In the case of the King v. Boyce, the prisoner was indicted for a capital felony under the riot Act, for that he and divers other persons to the number of one hundred, whose names are unknown to the jurors, &c. with; force and arms, &c. did begin to demolish and pull ’down, &c. : the jury found a special verdict that the unknown persons did begin to demolish, &c. and that the said, John was then and there present, and did then and there encourage and abet the said persons unknown, in beginning to demolish arid pull down the said dwelling house, by then and there shouting and using expressions to incite the said persons unknown- so to’ do — and that the said John did not, with force, begin to demolish or pull down, or do any act with his own hands or person for that purpose. No objection was taken to the form of the indictment, or to any discrepancy between the indictment and finding. It seemed to be conceded throughout the case, that if the finding made him a principal in the second degree, he was properly indicted as a principal in the first. It was held that the finding was sufficient, and judgment of death was pronounced upon the prisoner. These authorities, it seems to me, cover the whole position, and especially Boyce’s case, and show that although an act be done by one unknown, yet if another be actually or constructively present, aiding and abetting, it may be laid in the indictment as the act of the aider or abettor. Hawkins says, “ ’Where several are present, and abet a fact, and one only actually does it, an. indictment may, in the same manner as an appeal, lay it generally, as done by them all, or specially as done only by the one, and abetted by the rest.” So Plowden, 98, reports that it was ruled in the matters of the crown, beginning at Salop, that “ those that *137 Strike, and the rest that are present, are in equal degree, and each partakes of the deed of the other.” In the King v. Borthivick, the question was as to the sufficiency of a special verdict on an indictment against one as a principal in the first degree, and others as principals in the second degree, which found that some one of the prisoners (but who was, to the jurors, unknown) killed the deceased, and that they were all of the same company, hut did not find that they were all present aiding and abetting. The Court said, “ It is not necessary to say in words, that the prisoners were all present. If it were stated that they did some act, at the time, that would he sufficient, because the Court must then unavoidably see that they were present.” So in Messenger’s case the Judges say, “ where several acts of force are found to have been actually committed, in pursuance of the design, there is no need to find the prisoners to have been aiding and assisting, for that is only necessary to be found where the jury find a person was there amongst them, and find no particular act of force done by him, but only his presence.” The authorities from Hawkins and Plowden are directly to the point now in issue ; they show that in law the actual slayer and abettor commit the murder jointly, and that the distinction of principal in the first and second decree, was a mere distinction in fact. Borth-wick’s case and Messenger’s case show the same distinction, for they both concede that presence, actual or constructive, might have justified the jury to find the act of force of one the act of all.
The case of Fley and Rochelle is a more direct authority for this case, than any to which I have referred. In that ease the indictment charged “ that Isaiah Jenkins and Jesse Fley, on, &c. with malice aforethought, made an assault on David Minton, that'Jenkins with a gun shot Minton and mortally wounded him, so that he died on, &e.: that Fley was then and there present, maliciously aiding, &c. the felony and murder aforesaid to commit: and so the jurors aforesaid say, that the said Jesse Fley did, feloniously, &c. kill and murder the said David Minton, against the peace of the said State, and that Lovick Rochelle, the felony and murder aforesaid by the said Fley so committed, in manner aforesaid, the said Fley, the murder aforesaid to be so committed maliciously, &c. did incite and procure,” &e.
This form is unquestionably as novel as the one before us, for although it uses more technical words in describing the agency of the *138 actual slayer, and the abetment of Fley,yet it treats him as a principal in the first degree, and charges Eochelle as an accessary to him alone, and not to him and Jenkins jointly. Mr. Justice Brevard said, in answering the objection to the indictment, “ all persons present, aiding and abetting a murder, are regarded as principals and equally guilty. The actual perpetrator is regarded as the agent or instrument by which the crime is perpetrated, not as the chief criminal, or more guilty than his associates. It sometimes happens, that he is comparatively less guilty than they who stimulate or persuade him to be their instrument. The distinction between principal in the first and second degree, has been long since exploded.— It is now considered a distinction without a difference.”
In that case, as in this, the actual slayer was treated as a mere instrument by which Fley committed the murder, and the judgment of the Court sustaining the conviction under that indictment, certainly warrants us in sustaining the one before us. It cannot affect the validity of this indictment, that the person doing the act was unknown; if the fact be so (and the verdict of guilty so finds it,) it was the best description which could be given of the instrument by which the prisoner effected the murder; it was sufficient to enable the prisoner to answer the charge, and the jury to say whether the fact charged was true or false. The indictment here is, however, not without precedent to sustain it; in the case of the Regicides, it was held ^ie ^act beheading the King was well laid to have been done by some person unknown, with a vizor on his face. However little I might be disposed to concur in the general judgment of guilt in that case, yet I apprehend in this respect, that that case cannot be questioned. For it only follows out and gives effect to a general rule of Jaw, that the host description, in the power of the State, shall he given of all the circumstances which constitute the felony in the accused. It has, too, the sanction of Boyce’s case, already cited. For there it will be remembered, that the act done was found to have been committed by persons unknown, and the prisoner was present aiding and abetting: and it was held that he was liable to judgment thereupon.
The second ground alleges that the first count is insufficient. — ■ That count charges the murder to have been committed by a person unknown, and that the prisoner was accessary thereto before the fact. It would be sufficient to answer this, by saying that the conviction is upon a good count, and hence if the first was bad, it could *139 not avail tlie prisoner. But I am disposed to meet the objection at onee, and answer it. To make this count bad, it must be established that a murder cannot be committed by a person unknown. Such a position would, I presume, hardly be assumed by the learned counsel for the prisoner; but still without it, their argument cannot be supported. For an accessary before the fact, is he who counsels, commands, procures or incites another to do the act. A murder is committed, but the perpetrator is unknown. Is it from the fact that you cannot say who did it less a murder ? Unquestionably not! If it can be shown who counselled, commanded, procured or incited that murder, is not tho person thus ascertained, accessary to the crime of murder 1 It cannot be doubted that he is. If an indictment charge a crime for which the prisoner on conviction will be liable to judgment, it is good, and hence there can be no objection to it in that behalf. If, indeed, it had been necessary that the conviction of the principal should have been stated in the indictment, then the objection would have been fatal. But in Sims’s ease it was ruled that it was unnecessary to set out the conviction of the principal. It is, however, true that although this might not be cause to arrest the judgment for any defect in the indictment, yet if the accessary cannot, in the case of a murder committed by a person unknown, be put upon his trial until the principal be tried and convicted, judgment could not be given on the conviction on this count. But I apprehend that such a perfect security to crime is not to be found sanctioned by the common law. When tho principal was dead the accessary could be tried; and the reason there extends to this case. In both, unless the accessary can now be tried, he is forever to go free : and in both there is no danger that he may be convicted, and his principal afterwards acquitted. For in this case, as long as the murderer remains undiscovered, there can be no other trial— when discovered he must be convicted,
The 3d ground scarcely requires an answer: it has not been attempted by the counsel to point out other objections. — unless I am so to regard the exception urged, that the words “ in his hands,” used in the 3d count, went to show the sex of the slayer, and lienee that he could not be unknown. But this conclusion is not warranted by the premises: the sex of the slayer may be known, and yet his person be unknown.
The first ground of the motion for new trial cannot be sustained. *140 For if the first count were bad, still tbe evidence, applicable to it, applied also to the 2d and 3d counts, and could not have been excluded. For the circumstances proved in the case were all calculated to connect the prisoner with the murder. The jury were, however, not permitted to suppose that proof pointing to the conclusion, that the prisoner might be an accessary before the fact to an unknown person or to Head, would justify them in finding the piisoner guilty on the third count. The difference between the offences were carefully explained, and their attention directed to the means by which they might come to a right conclusion.
The second ground for new trial is equally untenable. The evidence offered and excluded, was an attempt to prove by parol, the result of a trial had in an inferior Court. To permit such evidence, would have been violating at once the rule that the best evidence in the power of the party, should be given. It was the duty of the justices to keep a record of the trial, and the presumption is that they did: if they did not, it was the prisoner’s business to show it, before parol evidence of an acquittal by them, of the negro Edom, could be given. The question has been made, I presume, from a mistaken' reading of the case of Lowry v. Pinson; that case sustains fully the position, that where a writing relates to a collateral circumstance, and is in possession of the party against whom it is to be used, the fact of its execution and contents may be proved without a notice to produce it. But that decision cannot affect this case. For here, like every other fact, it was to be proved, if it could avail the prisoner, by competent evidence.
As to the 3d ground, I have only to remark that gladly would I say, if I could, that the verdict was without evidence to sustain it. — ■ But the proof was enough to satisfy the jury, the Judge who tried the cause, and every one who heard the trial, of the prisoner’s guilt, and it cannot be that this Court would, (even if they doubted, which they do not,) against this weight of authority and opinion, order a new trial.
The 'motions are dismissed.
Johnson, Eaule, DeSaussure, Evans, and Butler, concurred.
G-antt, J. — I concur in the legal view taken of this case.
Bichardson, J. absent,
' Motion refused,